IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

NARESH I. BHATT, M.D.,                )
                                      )
            Plaintiff,                )
                                      )
      v.                              )     No. 2:03-cv-1578
                                      )
BROWNSVILLE GENERAL HOSPITAL,         )     Judge Thomas M. Hardiman
                                      )
            Defendant.                )

## OPINION

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NARESH I. BHATT, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:03-cv-1578 |
| | ) | |
| BROWNSVILLE GENERAL HOSPITAL, | ) | Judge Thomas M. Hardiman |
| | ) | |
| Defendant. | ) | |

## TABLE OF CONTENTS

I.   **FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

   A.   Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

   B.   Brownsville's By-Laws And Review Committees . . . . . . . . . . . . . . . . . . . . . . . . 2

   C.   Fair Hearing Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

   D.   Events Prompting Brownsville's Review Of Dr. Bhatt's Charts . . . . . . . . . . . . . 5

   E.   Brownsville's Reviews Of Dr. Bhatt's Patient Care Prior To October 2000 . . . . 6

   F.   Formation Of MEC Subcommittee To Review Dr. Bhatt's Charts . . . . . . . . . . . 8

   G.   Dr. Roberts' Report And Conclusions Regarding Dr. Bhatt's Patient Care . . . . 9

   H.   The MEC Votes To Recommend Revoking Dr. Bhatt's Privileges . . . . . . . . . . 10

   I.   The Fair Hearing Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

   J.   Evidence Presented At FHC Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        1.   Patient A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
        2.   Patient B . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
        3.   Patient C . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
        4.   Patient D . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

i

|   | 5. | Patient E | 15 |
|---|---|---|---|
|   | 6. | Patient F | 16 |
|   | 7. | Patient G | 17 |
|   | 8. | Patient H | 18 |

| K. | The Fair Hearing Committee's Deliberations And Conclusions | 18 |
|---|---|---|
| L. | Appellate Review Of The Fair Hearing Committee's Decision | 21 |
| M. | Evidence of Brownsville's Ulterior Motivation Relating To Prior Litigation | 21 |
| N. | Dr. Bhatt's Evidence Of Brownsville's Discriminatory Motivation For Revoking His Privileges And Interfering With His Practice Of Medicine | 22 |

| II. | LEGAL STANDARD | 23 |
|---|---|---|
| III. | ANALYSIS | 24 |

| A. | §1981 Claim | 25 |
|---|---|---|
|   | 1. | Prima Facie Case | 26 |
|   | 2. | Pretext Analysis Regarding The Hospital's Proffered Legitimate, Non-Discriminatory Reasons For Revoking Dr. Bhatt's Privileges | 29 |

| B. | Health Care Quality Improvement Act | 32 |
|---|---|---|
|   | 1. | Reasonable Belief That Action Was In Furtherance Of Quality Health Care | 34 |
|   | 2. | Reasonable Effort To Obtain The Facts | 36 |
|   | 3. | Adequate Notice And Hearing Procedures | 37 |
|   | 4. | Reasonable Belief That The Action Was Warranted By Known Facts | 42 |
|   | 5. | Summary Of HCQIA Immunity | 43 |

Plaintiff Naresh I. Bhatt, M.D. (Bhatt) sued Defendant Brownsville General Hospital (Brownsville or Hospital) after it revoked his staff privileges and allegedly interfered with his practice of medicine. Dr. Bhatt claims that the Hospital's adverse actions were taken because of his race in violation of 42 U.S.C. §1981. Dr. Bhatt also brought state law claims alleging that the Hospital breached its contractual obligations to him by violating its own by-laws prohibiting discrimination and by failing to provide him with a fair hearing. Brownsville seeks summary judgment on all of Dr. Bhatt's claims. For the reasons that follow, the Court will grant Brownsville summary judgment on all counts.

## I.     FACTS

Upon review of Brownsville's statement of material undisputed facts and Dr. Bhatt's response thereto, the record reflects that the following facts are undisputed.

### A.     Parties

At all times relevant hereto, Defendant Brownsville was an acute-care facility located in Brownsville, Pennsylvania that had approximately 93 beds and could provide care for about 60 patients at any given time.[1] Approximately 100 physicians had staff membership and clinical privileges at the Hospital, about one-third of whom were Indian and one-third of whom were born in the United States. The remaining physicians were born in a number of foreign countries such as Korea, the Philippines and Pakistan.

Although he is licensed to practice medicine in the Commonwealth of Pennsylvania, Dr. Bhatt was born in India and matriculated there at Jai Hind College in 1967 and Sheth G.S. Medical College in 1971. Dr. Bhatt joined the medical staff of Brownsville in 1979. At the

---

[1]     The Court notes that Brownsville General Hospital, like other community hospitals in the area, suffered a steady financial decline during the time since the filing of this lawsuit. The Hospital was sold in June of 2005 to a group of private physicians who operated it as a for-profit business under the name "Tara Hospital" until it closed on January 8, 2006. *See* Christopher Snowbeck & Caitlin Cleary, *Hospital closing symptomatic of small-town medicine*, Pittsburgh Post-Gazette, Jan. 10, 2006, *available at* http://www.post-gazette.com/pg/06010/635364.stm.

same time, he served on the medical staffs of various other health care institutions, including: Centerville Clinics, Inc. (Centerville Clinic or Centerville) in Fredericktown, Pennsylvania; Frick Hospital in Mt. Pleasant, Pennsylvania; Highlands Hospital in Connellsville, Pennsylvania; Monongahela Valley Hospital in Monongahela, Pennsylvania; and Uniontown Hospital (Uniontown) in Uniontown, Pennsylvania.

### B.    Brownsville's By-Laws And Review Committees

Brownsville maintained Medical Staff By-Laws (By-Laws) which, among other things, describe the rights and obligations of the Hospital's medical staff, establish and describe the functions of its committees, set forth policies and procedures for the operation of the Hospital, and prohibit discrimination. An Appendix to the By-Laws includes a "Fair Hearing Plan." The Fair Hearing Plan entitles medical staff members to a hearing in the event of denials, suspensions, revocations, reductions, or limitations of aspects of staff membership or clinical privileges at the Hospital, and sets forth procedures for those hearings.

Pursuant to the By-Laws, Brownsville maintained a Medical Executive Committee (MEC) comprised of no more than twelve members, including the Hospital's Chief of Staff, Vice-Chief of Staff, Immediate Past Chief of Staff, Secretary, Treasurer, Chairpersons of the Departments of Medicine and Surgery, Chairperson of the Credentials Committee, and two at-large members. The MEC had several functions, including:  receiving and acting upon reports and recommendations from the Hospital's departments and medical staff committees concerning quality assurance/performance improvement activities, and making recommendations to the Hospital's Board of Directors regarding clinical privileges, corrective action, termination of membership, and the mechanism for a fair hearing.

In addition to the MEC, Brownsville also maintained a Utilization Review Committee (URC), comprised of the Utilization Review Coordinator, Chief of Staff, Chief of Surgery, Chief of Medicine, Chief of Radiology, Director of the Rehabilitation Unit, representatives from Administration, Fiscal, Nursing, Social Service, the Psychiatric Center, Medical Records, and at

least two members of the Medical Staff. The URC conducted utilization review functions as required by the Hospital's Utilization Review Plan and reviewed medical charts prepared by physicians to ensure that they were providing proper care to Hospital patients.

Betty Marcolini, R.N. (Marcolini) served as Brownsville's Utilization Management Coordinator from 1997 until 2001. Accordingly, Marcolini reviewed the charts and records of all patients admitted to the Hospital. If the treatment met established criteria, Marcolini approved the case; otherwise, she discussed the issues with the physician. If a case still did not meet established criteria after the discussion with the patient's physician, Marcolini discussed the case with a utilization review physician advisor, who was a member of the URC. Marcolini testified that discrimination played no role in her work at Brownsville, including her work with Dr. Bhatt.

On those occasions that required consultation, the physician advisor would direct Marcolini to suggest that the patient's physician consider using a different care management strategy. Dr. Malkit Singh, Dr. Min Hi Park, Dr. John Martin or Dr. Bhagwan Wadhwani often served as the physician advisor with whom Marcolini spoke, depending upon their availability. If the patient's physician did not accept the physician advisor's suggestions, the physician advisor then would decide whether to submit the matter to the URC for review. Cases could be referred to the URC by a physician advisor or an entity outside the Hospital, such as a managed care company that denied payment or questioned care management. Charts selected for URC review by a physician advisor or outside entity are described as having "fallen out" for review.

The URC met approximately ten times per year. When the URC determined that a chart reflected patient care problems, it could ask the physician to explain the apparent problem. If the physician had no satisfactory explanation, the URC referred the charts to the MEC. Upon its receipt of charts that the URC referred, the MEC could review them and take further action. After it reviewed the charts, the MEC could recommend corrective action to the Hospital's Board of Directors, including suspension or revocation of the staff membership and clinical privileges of the physician in question. When the MEC voted to recommend corrective action, the physician was entitled to a hearing pursuant to the Fair Hearing Plan.

C.     **Fair Hearing Procedures**

Under the Fair Hearing Plan, when a physician against whom the MEC recommended corrective action requested a hearing, Brownsville's Chief of Staff appointed a Fair Hearing Committee (FHC) comprised of five members of the Hospital's medical staff, none of whom initiated or investigated the matter at issue. Under the Fair Hearing Plan, the presiding officer was either the Chairperson of the FHC or an appointed hearing officer. In addition, physicians appearing before the FHC were entitled to counsel and to call and examine witnesses, introduce exhibits, cross-examine and impeach witnesses, rebut any evidence, and request that the hearing be recorded.

Whenever a hearing was held pursuant to the Fair Hearing Plan, the MEC initially presented evidence in support of its recommendation. The subject physician then had to prove, by a preponderance of the evidence, that the grounds for the recommendation lacked any substantial factual basis or that the basis or conclusions drawn therefrom were arbitrary, unreasonable, or capricious. Under the Fair Hearing Plan, a hearing was finally adjourned when the FHC completed its deliberations. Within fourteen days thereafter, the FHC had to deliberate, make a written report of its findings and recommendations, and forward that report to the MEC. Within fourteen days after its receipt of the FHC report, the MEC had to consider the report, affirm, modify, or reverse its recommendation, and transmit the result to Brownsville's Chief Executive Officer.

Upon receipt of the decision of the MEC, the CEO was required promptly to send a copy thereof to the subject physician. If the decision was adverse, the CEO had to inform the physician of the right to request appellate review by Brownsville's Board of Directors by delivering a written request for appellate review to the CEO within fourteen days. If the physician appealed, the review was conducted by the Board of Directors as a whole, or by an Appellate Review Committee (ARC) of five members appointed by the Chairman of the Board. The ARC could allow the parties or their representatives to appear personally to state their positions. Upon conclusion of any oral statements, the appellate review was considered closed,

-4-

and the ARC deliberated.  Thereafter, the ARC could recommend that Brownsville's Board of
Directors affirm, modify, or reverse the action taken by the MEC, or could remand the matter to
the FHC.  Within seven days after the conclusion of the appellate review process, the Board of
Directors rendered its final decision in writing and sent notice thereof to the subject physician.
Under the Fair Hearing Plan, a physician who requested a hearing or appellate review agreed to
be bound by the provisions of Section 6.3-2 of the By-Laws, releasing the Hospital and its
representatives from any civil liability relating to the revocation of the physician's clinical
privileges.

### D.      Events Prompting Brownsville's Review Of Dr. Bhatt's Charts

On September 15, 1997, Centerville Clinic required Dr. Bhatt under threat of termination
to sign a Reform Agreement regarding his practices of prescribing controlled substances.  That
Agreement provided that Dr. Bhatt's failure to abide by its terms would be sufficient cause to
terminate his employment immediately.  Dr. Bhatt testified in his deposition that the
investigation into his prescription practices resulted from employees at Centerville stealing his
prescription pads and forging his signature.  He also testified that at least one employee was
arrested and criminally charged in connection with this practice.  Although Dr. Bhatt was
investigated, he was not arrested or charged for any wrongdoing.

On February 23, 1998, Centerville's Board of Directors voted not to renew Dr. Bhatt's
contract.  Dr. Bhatt testified that following Centerville's decision not to renew his contract, it
brought an action to enforce a restrictive covenant which precluded him from practicing within
twenty miles of Centerville for one year.  During Centerville's restrictive covenant action against
Dr. Bhatt, Kenneth Yablonski, who was President of the Board of Centerville, testified that the
primary reason that the contract was not renewed was that Dr. Bhatt was not happy at Centerville
and had previously asked to resign.

Some six months after Centerville chose not to review Dr. Bhatt's contract, in August
1998, Brownsville's MEC initiated a peer review of Dr. Bhatt's management of diabetic patients

by sending Dr. Bhatt's charts on a diabetic patient to an Associate Professor of Endocrinology and Metabolism at the University of Pittsburgh School of Medicine.  Based on the Associate Professor's findings and report, the MEC required Dr. Bhatt to obtain ten hours of education in diabetes management, which he completed.

Approximately a year later, in November 1999, the Medical Executive Committee of Uniontown Hospital recommended that Dr. Bhatt's appointment and clinical privileges not be extended beyond November 30, 1999.  In a letter to Dr. Bhatt dated November 18, 1999, the President and CEO of Uniontown Hospital wrote:

> The reasons for this recommendation are your failure to meet your burden of establishing that you satisfy the qualifications of medical staff appointment and the basic responsibilities of medical staff membership, specifically, your obligation to abide by the medical staff bylaws, rules and regulations and all other lawful standards and policies, and that you prepare and complete in a timely fashion and in accordance with medical staff policies, appropriate medical records, and that you abide by the ethical principles applicable to your profession.

On or about November 30, 1999, after receiving the November 18, 1999 letter, Dr. Bhatt resigned from Uniontown Hospital.  Uniontown reported Dr. Bhatt's loss of clinical privileges to the National Practitioner Data Bank (NPDB), an information clearinghouse which collects and releases information related to the professional competence of physicians, including suspensions, revocations, or other adverse actions.  Dr. Bhatt filed a response to the NPDB entry disputing the legitimacy and accuracy of the reasons given for the action.

### E.    Brownsville's Reviews Of Dr. Bhatt's Patient Care Prior To October 2000

On April 3, 2000, after it learned of the adverse action report against Dr. Bhatt that Uniontown had submitted to the NPDB, Brownsville's MEC voted to send a letter to Dr. Bhatt asking for his explanation of the adverse action report.  By letter to Brownsville dated April 17, 2000, Dr. Bhatt explained that Uniontown's CEO had informed him that it would not report him to the NPDB if he resigned from Uniontown.  Dr. Bhatt further explained that he was "back

stabbed" by Uniontown; and that the incident at Uniontown occurred because Dr. Bhatt had sued
it twice for refusing to grant him privileges there.

At a meeting on May 1, 2000, based on the adverse action report that Uniontown had
submitted and on Dr. Bhatt's explanation of that report, the MEC voted to monitor Dr. Bhatt's
inpatient progress notes for a period of three months. During the period of monitoring, from May
2, 2000 to August 2, 2000, Dr. Bhatt maintained his progress notes in accordance with Hospital
policy and without retroactive misrepresentation.

At a meeting of the Department of Medicine on July 13, 2000, Dr. Bhagwan Wadhwani, a
URC member who is Indian, informed the MEC of suspected problems with the medical care Dr.
Bhatt provided to a patient who had died.[2] In August 2000, the URC observed issues regarding
Dr. Bhatt's care of four patients who had been admitted to the Hospital that month and referred
charts on those patients to the Department of Medicine.

On October 4, 2000, Dr. Malkit Singh, who is Indian, wrote to Dr. Bhatt to advise him
that the Department of Medicine "felt very strongly that the fluid management for [a patient of
Dr. Bhatt's] was unsatisfactory," that the patient's fluids should have been reviewed and adjusted
daily, that the fluids should have been discontinued due to many factors, and that it was
"absolutely essential that [Dr. Bhatt] closely monitor fluids for patients and make appropriate
adjustments as needed." That same month, the URC determined that two of Dr. Bhatt's charts
reflected patient care issues, and referred them to the MEC. At this meeting, the URC gave Dr.
Bhatt the opportunity to explain the charts in question. After answering some questions
regarding allegedly excessive and inappropriate testing that he had ordered for patients, Dr. Bhatt
grew frustrated with what he perceived were repetitious questions that failed to acknowledge his
prior answers and walked out of the meeting, slamming the door.

---

[2]     Although the Hospital alleges that care issues existed as to two patients, Dr. Bhatt asserts that
only one of his patients was reviewed. Dr. Bhatt denies any misfeasance concerning the patient
at issue, but does not deny that the issue was brought before the MEC.

**F.      Formation Of MEC Subcommittee To Review Dr. Bhatt's Charts**

The charts referred by the URC at the October 2000 meeting were reviewed by the MEC at a meeting held on November 6, 2000 at which it determined that Dr. Bhatt's charts reflected many problems. Accordingly, the MEC voted to form a subcommittee consisting of Brownsville's Chief of Staff, Chief of Medicine, Chief of Surgery, and CEO, to review Dr. Bhatt's charts that had fallen out for review. In attendance at the November 6, 2000 MEC meeting were: Dr. Ravindra Mehta, Credentials Chairman; Dr. Milena Janicijevic, Vice-Chief of Staff; Dr. Vincent Alcantara, immediate Past Chief of Staff; Dr. John Martin, Treasurer; Dr. Malkit Singh, Chief of Medicine; Dr. Ashok Sahai, Chief of Surgery; and Dr. Durga Malepati, At-Large Member. Doctors Mehta, Singh, Malepati and Sahai are Indian and Dr. Alcantara is Filipino.

The MEC subcommittee that had been formed to review Dr. Bhatt's charts met on November 16, 2000, and in attendance were: Dr. John Ewald, Chief of Staff; Dr. Malkit Singh, Chief of Medicine; Dr. Ashok Sahai, Chief of Surgery; Karen Fuducia, the Hospital's Interim Chief Executive Officer; and Danette Minehart, Medical Staff Coordinator. The MEC subcommittee reviewed ten of Dr. Bhatt's charts that had fallen out for review and determined that problems existed in nine of them, including a failure to respond to committees, fluid management problems, transfusion-related issues, and inappropriate testing. The MEC subcommittee then voted to meet with Dr. Bhatt to communicate to him the trends and patterns that were found during its review. The MEC and Dr. Bhatt met on November 29, 2000 and Dr. Bhatt admitted that he was aware that there were problems associated with his charts. The MEC subcommittee decided to review any of Dr. Bhatt's charts that may fall out for review during the three-month period from December 1, 2000 through March 1, 2001, and the three-month period from March 1, 2001 through June 1, 2001, to determine if any of the same trends or patterns continued to exist. The MEC subcommittee would then report its findings to the MEC. The MEC subcommittee noted on March 8, 2001 that none of Dr. Bhatt's charts had fallen out for review during the three-month period from December 1, 2000 to March 1, 2001.

-8-

At a meeting on May 24, 2001, the URC noted that one of Dr. Bhatt's charts indicated that he had admitted to the Hospital a patient who did not meet the criteria for admission. The URC also questioned Dr. Bhatt's failure to adjust the patient's medications. On July 26, 2001, the URC decided to send several of Dr. Bhatt's charts to an outside reviewer and the MEC voted to approve that decision on August 6, 2001. On August 10, 2001, the Hospital wrote to Dr. Bhatt to inform him that four of his charts were being sent to an outside reviewer because of a continuous pattern of medical care that diverged from Hospital standards.

On October 3, 2001, in accordance with the URC's decision to send several of Dr. Bhatt's charts to an outside reviewer, Brownsville sent four of his patient charts to Dr. Mark S. Roberts, who at the time was an Associate Professor of Medicine, an Associate Professor of Health Services Administration, and Chief of the Section of Decisions Sciences and Clinical Systems Modeling at the University of Pittsburgh. Dr. Roberts had graduated *cum laude* with a Bachelor of Arts degree in Economics from Harvard College in 1977, earned his M.D. from Tufts University School of Medicine in 1984, and a Masters of Public Policy from the John F. Kennedy School of Government at Harvard University in 1984. Dr. Roberts is board-certified in internal and geriatric medicine and licensed to practice medicine in Massachusetts and Pennsylvania. Dr. Roberts had also taught medicine at Harvard Medical School, the University of Pittsburgh School of Medicine, and practiced medicine at Shadyside Hospital.

### G.    Dr. Roberts' Report And Conclusions Regarding Dr. Bhatt's Patient Care

On November 7, 2001, Dr. Roberts submitted his report on Dr. Bhatt's cases in which he concluded that "in three of the four charts there are multiple examples of care that are, in my opinion, substantially below reasonable standards of care for the complaints and diagnoses for which the patients presented." Dr. Roberts also stated that "the nature of the lapses from standard care also appear to indicate a level of attention to clinical detail that allowed the clinician to miss obvious and significant signs of worsening clinical status." In one case, Dr. Roberts stated that "inappropriate fluid management was a significant contributor" to the

-9-

patient's death, although "it is important to remember that this patient was quite ill upon presentation. She was a 98 year-old female with probable sepsis, and she had a high expected mortality rate from what was likely an occult infection." Dr. Roberts' report was distributed to Dr. Bhatt and all members of the MEC at a meeting on December 5, 2001. The MEC offered Dr. Bhatt the opportunity to provide information in conjunction with its review of Dr. Roberts' report.

On December 9, 2001, Dr. Bhatt wrote to the Chairman of the URC to inform him that he had reviewed Dr. Roberts' report and "agreed with the suggestions that have been made." Dr. Bhatt also said he would: exercise great caution in fluid replacement therapy for patients with congestive heart failure, use consultations liberally for difficult cases, scrutinize thyroid replacement therapy with extreme caution, and obtain additional hours of continuing medical education in the fields of congestive heart failure and thyroid disease.

## H.    The MEC Votes To Recommend Revoking Dr. Bhatt's Privileges

At a meeting on December 10, 2001, the MEC noted that Dr. Roberts' report, along with other reports from various Hospital committees, showed a trend of substandard patient care provided by Dr. Bhatt. The following doctors attended the December 10, 2001 MEC meeting: Vicente Alcantara, Walter Bobak, John Ewald, John Martin, I. Prakorb, Ashok Sahai, Malkit Singh, and Mona Zaglama. At the meeting, the MEC voted to recommend to Brownsville's Board of Directors that Dr. Bhatt's staff membership and clinical privileges be revoked.

On December 12, 2001, Dr. Bhatt requested a leave of absence from the Hospital "due to personal health reasons." By letter dated December 13, 2001, the Hospital informed Dr. Bhatt of the MEC's decision to recommend revocation of his privileges and informed him that "the ongoing monitoring of the care rendered by you at Brownsville Hospital reveals a pattern of care which is substantially below any reasonable or acceptable standard of care."

I.      **The Fair Hearing Process**

In its December 13, 2001 letter, the Hospital enclosed a copy of its Fair Hearing Plan and informed Dr. Bhatt that he had fourteen days after receipt of the letter to request a hearing. By letter dated December 25, 2001, Dr. Bhatt requested a hearing. On January 7, 2002, the Hospital's Board of Directors granted Dr. Bhatt's request for a leave of absence.

The FHC assembled by the MEC consisted of doctors James Dahl, Denise Ginart, Anita McDonald, Robert Smith, and Ravindra Vajjhala, who is Indian. All of these physicians were on staff at Brownsville at the time of the hearing. Drs. Dahl, Ginart, and McDonald were all family practitioners while Drs. Smith and Vajjhala practiced emergency medicine at Brownsville. Dr. Bhatt asserts that FHC member Drs. Dahl, Ginart, and McDonald were also affiliated with Centerville Clinic, with which Dr. Bhatt had previously been affiliated.

Dr. Bhatt retained Tomm A. Mutschler, Esq. of Mount Pleasant, Pennsylvania, to represent him at the fair hearing. In or about January 2002, Brownsville informed attorney Mutschler that Dr. Bhatt's hearing was scheduled for January 31, 2002. Mutschler requested a postponement, which was granted by letter dated January 24, 2002, in which Brownsville requested that Mutschler contact the Hospital's counsel to discuss new hearing dates. At some point thereafter, Dr. Bhatt replaced attorney Mutschler with attorney William Maruca of Kabala & Geeseman. By letter dated April 19, 2002, Brownsville's CEO advised attorney Maruca that Dr. Bhatt's hearing was rescheduled for May 16, 2002 and disclosed the names of the patients who would be discussed at the hearing.

The hearing on the MEC's recommendation that Dr. Bhatt's staff privileges be revoked was held during three days (May 16, 2002, July 24, 2002, and September 4, 2002) and lasted over eight hours. Darice McNelis, an attorney with Buchanan Ingersoll, P.C., served as the Hearing Officer, attorney Maruca represented Dr. Bhatt, and Anne Mullaney, an attorney with Thorp Reed & Armstrong LLP, represented Brownsville's MEC at the hearing.

At the beginning of the hearing, Hearing Officer McNelis advised the attendees of the Fair Hearing Procedures and administered oaths to the witnesses. Attorney Mullaney provided

-11-

the FHC and attorney Maruca with a binder containing the exhibits to which the Hospital's witnesses would be referring, which included Dr. Roberts' November 7, 2001 report and his *curriculum vitae*. Attorneys Mullaney and Maruca both made opening statements at the beginning of the hearing and Drs. Ewald, Singh, and Park testified in support of the revocation of Dr. Bhatt's staff privileges.

Dr. Harry Haus, who was never on staff at Brownsville, testified on Dr. Bhatt's behalf. Dr. Haus graduated from the University of Pittsburgh with a B.A. and M.B.A. in 1979, and earned his M.D. from Albany Medical College in 1986. Dr. Haus is board certified in family practice, quality assurance and utilization review. After completing his residency in 2001, Dr. Haus worked in utilization review for K.E.P.R.O., an organization that reviews Medicare and Blue Cross/Blue Shield cases for hospitals. Dr. Haus later became Medical Director of Monongahela Valley Hospital.

Evidence was presented regarding nine patients of Dr. Bhatt, eight of whom are discussed below *seriatim*.

### J.  Evidence Presented At FHC Hearing

#### 1.  Patient A[3]

##### a.  Evidence Presented By MEC

Dr. Ewald, who then was Chief of Staff at Brownsville, testified regarding Patient A for the MEC. A graduate of Muhlenberg College and the Milton S. Hershey College of Medicine, Dr. Ewald is board-certified in internal medicine, nephrology and geriatrics. At the hearing, members of the FHC questioned Dr. Ewald about his testimony and his review of Patient A's charts. Attorney Maruca cross-examined Dr. Ewald.

---

[3]     To protect patient privacy, the patients discussed at the hearing were identified by the parties as patients A, B, C, D, E, F, G, H, and I. This Opinion refers to these patients by the same designations. Because Brownsville's Statement of Undisputed Material Facts does not cite any substantive evidence presented to the FHC regarding Patient I, however, the Court will only consider the facts of record regarding Patients A-H.

Patient A's chart had fallen out in a death review. According to Dr. Ewald, Patient A had received "17.2 liters of fluid with a urine output of 5.7 liters for a net gain of 11.5 liters. Chest x-rays continued to show worsening congestive heart failure and the fluid management here was questioned." Dr. Ewald further testified: "although the patient was 98, elderly, and one could argue not a good candidate necessarily to survive, the issue for the reviewer that brought this to our attention was, this fluid management made absolutely no sense." Dr. Ewald's testimony was consistent with the opinion of the outside reviewer, Dr. Roberts, who concluded that "the inappropriate fluid management was a significant contributor to [Patient A's] death."

### b.    Evidence Presented By Dr. Bhatt

Through his testimony and report, Dr. Haus opined that Patient A's fluids were not mismanaged by Dr. Bhatt. Dr. Haus opined that Patient A had obvious signs of dehydration, and that decreasing or stopping intravenous fluids would have exacerbated the patient's fever, dehydration, hypovolemia, and renal condition. Dr. Haus further noted that neither nursing nor pharmacy objected to Dr. Bhatt's course of treatment and that Dr. Bhatt was not notified when the patient's condition, which had been improving, began to deteriorate. Finally, Dr. Haus testified that Patient A had less fluid output than fluid input simply because of dehydration.

### 2.    Patient B

### a.    Evidence Presented By MEC

Dr. Ewald testified for the MEC regarding Patient B, whose chart fell out for review to inquire why the patient was taken from the medical ward to the psychiatric floor with a heart rate of forty-seven and then continued on beta-blockers and digoxin. Dr. Ewald also testified that a heart rate of "47 in someone who already is elderly with a lot of medical problems should be an indicator . . . to keep the patient on the floor. . . ."

### b.    Evidence Presented By Dr. Bhatt

Both Dr. Bhatt and Dr. Haus defended the decision to transfer Patient B to the psychiatric ward. They testified that Patient B was stable at the time she was transferred and for nearly two weeks thereafter, during which time Dr. Mehta was the attending physician. Dr. Bhatt further

-13-

testified that he was not informed of any medical problems with Patient B while she was in the psychiatric ward.

### 3.  Patient C

#### a.  Evidence Presented By MEC

Dr. Ewald testified for the MEC regarding Patient C, whose chart fell out for review because Dr. Bhatt had not ordered intravenous fluids for twenty-four hours after the patient's admission to the Hospital.  Dr. Ewald opined that waiting to provide fluids was inconsistent with the standard of care for treating hyperglycemia or septicemia.

#### b.  Evidence Presented By Dr. Bhatt

Both Dr. Bhatt and Dr. Haus disputed the assertion that Patient C should have been placed on intravenous fluids upon presentation at the Hospital.  Dr. Bhatt testified that intravenous fluids were unnecessary because Patient C was able to take oral fluids upon arrival. Dr. Haus stated that attempting to correct a dehydration problem by having a patient take fluids orally is not a breach of the standard of care, particularly when the results of the tests had not yet been received that would show which, if any, intravenous treatments are needed.

### 4.  Patient D

#### a.  Evidence Presented By MEC

Dr. Ewald testified for the MEC about the review process regarding Patient D.  The Hospital's Tissue Lab Blood Bank Committee (TLBBC) had asked Dr. Bhatt to explain why he did not use the fresh frozen plasma he had ordered for Patient D.  After Dr. Bhatt's response to the TLBBC was delayed, the MEC then asked Dr. Bhatt to respond to the question.  Dr. Ewald testified that when Dr. Bhatt responded, he instead explained why plasma was required in treating Patient D,  indicating that he had used the plasma.  Dr. Ewald also testified that Dr. Bhatt's failure to respond properly to the question made it appear to the committee that Dr. Bhatt was not taking seriously the review process regarding the fresh frozen plasma issue.

#### b.  Evidence Presented By Dr. Bhatt

Dr. Bhatt testified that he did not fail to respond to the TLBBC for several months

-14-

regarding its inquiry into his nonuse of the fresh frozen plasma ordered for Patient D. Rather, Dr. Bhatt asserted that he responded to the committee verbally, and did not know that a written response was required. Dr. Bhatt acknowledged that the letter he later submitted to the MEC inaccurately indicated that he had used the fresh frozen plasma when he had not, but characterized the mistake as an unintentional error.

### 5.    Patient E

#### a.    Evidence Presented By MEC

The MEC's second witness at the hearing was Dr. Malkit Singh. At the time of the hearing, Dr. Singh was Chairman of Brownsville's Department of Medicine. Members of the FHC questioned Dr. Singh about his testimony and review of the patients' charts. Attorney Maruca cross-examined Dr. Singh.

Dr. Singh testified that Patient E "came for a fracture of the knee and thrombophlebitis and ended up having unnecessary testing and unnecessary treatment which killed her." Dr. Singh testified that Patient E was given an unnecessary gastroscopy and an unnecessary colonoscopy because the blood found in her stool was likely caused by the drug Toradol, which she was taking. Dr. Singh testified that Patient E had a ruptured colon after the colonoscopy, and did not receive proper care thereafter. Specifically, Dr. Singh testified that Patient E was ordered to have a barium swallow when she "already had a rupture of the colon and peritonitis."

Dr. Singh testified further that Patient E should not have been admitted to the Hospital and that her final diagnosis was incorrect. Dr. Singh opined that other aspects of Patient E's treatment were improper as well. For example, Patient E's electrolytes went untested for five days "when the patient was receiving high doses of Lasix." In Dr. Singh's opinion, Patient E's blood urea nitrogen (BUN) levels should not have been ignored for "another two days," and Kay-Ciel (a potassium chloride solution) should have been added to Patient E's intravenous fluids. Dr. Singh also questioned the administration of the drug digoxin to Patient E, as he knew of no rationale for administering that drug to her, and questioned the lack of testing of Patient E's digoxin levels prior to January 1, 2000. Dr. Singh also testified that Patient E "probably" should

have been given only one unit of blood instead of two. Overall, Dr. Singh testified that Patient E's treatment fell "much below" the Hospital's standard of care.

### b.   Evidence Presented By Dr. Bhatt

Dr. Haus disputed Dr. Singh's allegations that the gastroscopy and colonoscopy performed on Patient E were unnecessary. He testified that after a hematologist was unable to discern the cause of the patient's anemia, the normal procedure is to look to the gastro-intestinal tract as the source of the bleeding. Dr. Haus noted that Dr. Bhatt did not perform Patient E's colonoscopy. Moreover, he opined that there was no proof that the colonoscopy, rather than a diverticular disease, was the cause of the suspected perforation.

Dr. Haus also disputed Dr. Singh's assertions that Patient E should not have been admitted to the Hospital, stating that it would be difficult to place a 93 year-old woman with a broken femur into a skilled-care facility, citing the fact that Medicare requires a three-day hospital stay for the patient to be eligible for a Medicare admission to one of those facilities. Dr. Haus also opined that sending Patient E to her own home or a personal care home was not a viable option because intravenous treatments could not be administered in those environments. Dr. Haus also criticized the fact that this chart was reviewed by Dr. Wadhwani, who himself cared for Patient E when Dr. Bhatt was out of town.

Dr. Haus' report further disputed Dr. Singh's allegations, noting that Dr. Bhatt was not made aware of the BUN results immediately, and that Dr. Bhatt began intravenous fluids once he was made aware that the patient's BUN was elevated.

### 6.   Patient F

### a.   Evidence Presented By MEC

Dr. Singh testified for the MEC regarding Patient F, who presented with bronchitis and sinusitis. Dr. Singh opined that Patient F did not meet the criteria for admission to the Hospital, and that Dr. Bhatt ordered an "unnecessary" hematology consultation for that patient. Of primary concern to Dr. Singh was the failure to manage Patient F's thyroid condition. Dr. Roberts' report also criticized the care provided to Patient F, opining that it was "hard to provide justification for

-16-

the intravenous antibiotics especially given (from the chart) that [Patient F] was sent home without oral antibiotics."

### b.   Evidence Presented By Dr. Bhatt

Despite characterizing it as a "weak admission," Dr. Haus defended the decision to admit Patient F when she presented with bronchitis and sinusitis because outpatient treatment had failed to resolve the condition and the patient had extremely high blood pressure.  Dr. Haus also noted that under normal Hospital policies and procedures, inappropriate admissions are flagged for certification by the Hospital on the day of admission, which did not occur in the case of Patient F.  Dr. Haus opined that the hematology consultation ordered by Dr. Bhatt was warranted because the patient exhibited an elevated white blood cell count.

Dr. Haus also disputed the finding in Dr. Roberts' report concerning the antibiotic treatment prescribed for Patient E, asserting that outpatient treatment with oral antibiotics had already failed prior to admission, warranting intravenous antibiotics.

### 7.   Patient G

### a.   Evidence Presented By MEC

Dr. Singh opined that Patient G did not meet criteria for admission to the Hospital.  He also testified that Patient G had two unnecessary electrocardiograms and found Dr. Bhatt's treatment was inconsistent with the Hospital's standard of care.

### b.   Evidence Presented By Dr. Bhatt

In his report, Dr. Haus defended Dr. Bhatt's decision to admit Patient G to the Hospital, citing her BUN of 39 and creatine level of 2.0.  Dr. Haus asserted that either of these test results would meet the Hospital's guidelines for admission.  Regarding the allegedly unnecessary electrocardiograms administered to Patient G, Dr. Haus testified that Dr. Bhatt ordered the initial electrocardiogram on the day the patient was admitted, and that the other electrocardiogram was ordered by a consulting cardiologist, not Dr. Bhatt.

### 8.     Patient H

#### a.     Evidence Presented By MEC

Dr. Min Hi Park was the MEC's third witness at the hearing, and testified regarding Patient H. At the time of the hearing, Dr. Park was Chairman of Brownsville's Utilization Review Committee. It appears that the primary evidence before the FHC regarding Dr. Bhatt's handling of Patient H was the report of Dr. Roberts. In Dr. Roberts' opinion, Patient H was not properly treated because the patient had recurrent atrial fibrillation but "was not on any form or [sic] chronic anticoagulation." Dr. Roberts opined that Patient H should have been "placed on anti-coagulation, and would have benefitted from taking an aspirin on a daily basis." Attorney Maruca cross-examined Dr. Park.

#### b.     Evidence Presented By Dr. Bhatt

Dr. Haus defended Dr. Bhatt's treatment of Patient H, asserting that he acted appropriately by consulting with a cardiologist immediately upon the patient's admission to the Hospital. Dr. Haus' report stated that cardiac care is provided by the cardiologist in a case of atrial fibrillation, and that medication orders (such as those for anti-coagulants) would come from the cardiologist and not from Dr. Bhatt as the primary care physician. Dr. Haus further testified that the aspirin therapy recommended in Dr. Roberts' report would have resulted in malpractice because the patient was already prescribed Coumadin, which cannot be taken simultaneously with aspirin.

Dr. Haus acknowledged that Dr. Bhatt did not identify heart sounds correctly in his treatment of Patient H, but asserted that this finding was "of minor note" and that the cardiologist agreed with Dr. Bhatt's treatment plan.

### K.     The Fair Hearing Committee's Deliberations And Conclusions

At the conclusion of the hearing, Hearing Officer McNelis stated that the parties would have ten days after receipt of the hearing transcript to submit their written statements. On October 2, 2002, attorney Mullaney submitted the MEC's written statement and attorney Maruca

-18-

submitted Dr. Bhatt's written statement.

The following day, October 3, 2002, the FHC deliberated for almost two hours before concluding that the MEC's recommendation to revoke Dr. Bhatt's staff membership and clinical privileges was factually justified and was not arbitrary, unreasonable, or capricious. At the end of the deliberations, the FHC took a secret ballot to determine whether the MEC's recommendation to revoke Dr. Bhatt's membership and privileges at the Hospital should be affirmed. The FHC voted 4-1 to affirm the MEC's recommendation.

The lone FHC member who voted against the recommendation to revoke Dr. Bhatt's privileges was Dr. Vajjhala. In his deposition, Dr. Vajjhala testified that he voted against the recommendation to revoke Dr. Bhatt's privileges because he was concerned that the Hospital was in serious trouble because it was losing primary care physicians, and that Dr. Bhatt's expulsion would have meant the loss of several patients and admissions, which in turn would have led to a faster decline of the Hospital.[4] Apart from these practical concerns, Dr. Vajjhala testified that he believed that Dr. Bhatt's standard of care was "substandard" and he believed that Dr. Bhatt would only be able to meet the Hospital's standard of care if he received "intense supervision." Dr. Vajjhala further testified: "[a]t no point I felt any racial prejudice was in place."

The FHC stated its conclusions in a Report and Recommendation of Hearing Committee, which recommended that Dr. Bhatt's privileges be revoked. All five members of the FHC signed the Report and Recommendation which stated:

> The Hearing Committee concluded that there were significant issues concerning Dr. Bhatt's professional judgment and quality of care. The Hearing Committee also concluded that Dr. Bhatt's performance in these cases demonstrated a general lack of overall clinical judgment and lack of understanding of a disease process and/or course of treatment which would be consistent with proper care. The Hearing Committee further concluded that Dr. Bhatt's performance in these cases demonstrated poor patient management (Patients A, C and E) and specific performance issues with respect to fluid management (Patient A and C), a basic patient

---

[4]     As the Court noted previously, *see* n.1 *supra*, Dr. Vajjhala's fears regarding the decline of the Hospital came to fruition when the Hospital was sold to private physicians in June of 2005 and was subsequently closed on January 8, 2006.

care concept. The Hearing Committee's conclusions in this regard
are supported by the evidence and testimony presented.

It is the Hearing Committee's decision that the professional
judgment and quality of care issues raised by these cases constitute
a substantial factual basis in support of the Medical Executive
Committee's recommendation. The Hearing Committee is of the
opinion that the Hospital would be neglecting its responsibilities
with regard to patient care if the recommendation of the Medical
Executive Committee were not affirmed.

In summary, the Hearing Committee believes that the
Medical Executive Committee was justified in recommending that
Dr. Bhatt's staff membership and clinical privileges be revoked
under these facts, and that Dr. Bhatt has not demonstrated that the
Medical Executive Committee's recommendation lacked any
substantial factual basis or that such basis or the conclusions drawn
therefrom were either arbitrary, unreasonable, or capricious.

Dr. Bhatt concedes that there was no discussion of his race or national origin during the
hearing, and has admitted the Hospital's assertion that there was no discussion of Dr. Bhatt's race
or national origin during the FHC's deliberations. Three members of the FHC – Dr. Smith, Dr.
Ginart and Dr. Vajjhala – have provided testimony or affidavits stating that Dr. Bhatt's race and
national origin played no role in the FHC hearing or in the FHC's conclusions reached in its
Report and Recommendation.

On October 17, 2002, the Hearing Officer forwarded the FHC's Report and
Recommendation to the MEC. On October 22, 2002, the Hospital notified Dr. Bhatt that the
MEC reviewed the FHC's Report, voted to affirm its recommendation that Dr. Bhatt's staff
membership and privileges be revoked, and informed Dr. Bhatt that he had a right to request
appellate review. On October 30, 2002, Dr. Bhatt requested appellate review of the FHC's
decision.

On November 25, 2002, the Hospital informed Dr. Bhatt that his appellate review was
scheduled for December 9, 2002. After the FHC issued its Report and Recommendation, Dr.
Bhatt replaced attorney Maruca with Neal A. Sanders, Esq., to represent him both in the fair
hearing process and in a legal malpractice lawsuit against attorney Maruca and his law firm.

**L.      Appellate Review Of The Fair Hearing Committee's Decision**

The appellate review originally scheduled for December 9, 2002 was postponed to accommodate attorney Sanders' schedule.  The Appellate Review Committee (ARC) met once, on February 18, 2003, to review whether the fair hearing process was proper, thorough, and fair to Dr. Bhatt.  Dr. Bhatt admits that his race and national origin were not discussed during the appellate review process.  After deliberation, the ARC affirmed the decision of the FHC to recommend revocation of Dr. Bhatt's privileges.

On March 11, 2003, the Hospital's Board of Directors received and reviewed the ARC's recommendation and voted to affirm the MEC's and the ARC's recommendations to revoke Dr. Bhatt's staff membership and clinical privileges.  On March 17, 2003, the Hospital's Board of Directors informed Dr. Bhatt by letter of its decision to revoke his privileges.  Dr. Bhatt is the only Indian doctor to lose privileges at the Hospital.

**M.      Evidence Of Brownsville's Ulterior Motivation Relating To Prior Litigation**

Dr. Bhatt testified that the Hospital revoked his privileges not because of the quality of care that he provided to patients, but rather because of a conspiracy to ruin his career that began in the mid-1990's when his wife sued Centerville Clinic and one Dr. Bolosky, with whom she had an extramarital affair, alleging "[s]exual misconduct with a patient."

Dr. Bhatt testified that he believes the participants in the conspiracy to ruin his career are Centerville Clinic, Uniontown Hospital, Kenneth Yablonski, Esq., Joseph Yablonski, Esq., Ed Yablonski, Judge David Gilmore, James Davis, Esq., Dr. John Ewald, and Dr. Bolosky.  Dr. Bhatt further testified that he believes the conspiracy was controlled by attorney Kenneth Yablonski, who died in September 2002.  Dr. Bhatt testified that Kenneth Yablonski told him in a dream that he was going to expel Dr. Bhatt and have all of his charts reviewed.  For these reasons, Dr. Bhatt asserts that the Hospital's inclusion of anyone affiliated with Centerville Clinic on the FHC or ARC panels was inappropriate.

-21-

During Dr. Bhatt's deposition on August 17, 2004, he was questioned extensively regarding the alleged conspiracy. After a break in the deposition concluded at 11:00 a.m., Dr. Bhatt provided the following testimony in response to a question from the Hospital's counsel:

> Q.   [Hospital's Counsel]: Now, Dr. Bhatt, this lawsuit you brought is over the revocation of your privileges at Brownsville General Hospital. And as you know, I think, the hospital says that your privileges were revoked because you failed to meet the standard of care. What do you think the real reason is?
>
> A.   [Plaintiff]: The real reason is an ulterior agenda that Kenny Yablonski had and has and used his cousin Ed Yablonski, who is at Brownsville Hospital, to control them. He's controlling everybody, and his agenda is to get rid of me, and to permanently ruin my career and drum me to India.

After Dr. Bhatt provided this testimony, and merely eight minutes after the parties' prior break had concluded, Dr. Bhatt's counsel requested another break. Immediately after the second break, the following exchange occurred:

> A.   [Plaintiff]: Would you please repeat your last question?
> Q.   [Hospital's Counsel]: Why don't you please repeat it back. [Record read]
> Q.   [Hospital's Counsel]: Now, you said that Mr. Ken Yablonski had an ulterior agenda. What was the ulterior agenda?
> A.   [Plaintiff]: Because I am an Indian, because of my race, they want to get rid of me.

### N.   Dr. Bhatt's Evidence Of Brownsville's Discriminatory Motivation For Revoking His Privileges And Interfering With His Practice Of Medicine

In addition to the deposition testimony set forth *supra*, Dr. Bhatt cites two incidents as evidence of the Hospital's discriminatory motives for revoking his privileges. First, Dr. Bhatt testified that in 2000 he went to Dr. Ewald for advice concerning the heightened scrutiny to which his charts were being subjected. He testified that Dr. Ewald responded by stating that Dr. Bhatt is an Indian, that he has no chance, and the Hospital should have thrown him out a long time ago. Dr. Bhatt also alleges that Dr. Ewald yelled at Dr. Haus during the FHC hearing for defending Dr. Bhatt, though these remarks are not alleged to have indicated any racial bias

against Dr. Bhatt.

It is true that Dr. Ewald was Chairman of the Medical Evaluation Committee that initially recommended that Dr. Bhatt's privileges be revoked. By virtue of his position as the Chairman of the MEC, Dr. Ewald was also responsible for presenting the MEC's findings to the Board of Directors. However, Dr. Ewald was not a member of either the Fair Hearing Committee or Appellate Review Committee that reviewed the MEC recommendation, nor was he a member of the Board of Directors that made the final decision to revoke Dr. Bhatt's privileges. Rather, Dr. Ewald was a fact witness at the FHC proceedings, and was subject to cross-examination by Dr. Bhatt's lawyer.

Dr. Bhatt also has testified that James Davis, Esq., a former member of the Hospital Board of Directors, made racially charged remarks to Dr. Bhatt at a 1997 hearing concerning the Centerville Clinic employee who was charged with stealing Dr. Bhatt's prescription pads. According to Dr. Bhatt, Davis told him that he "can't speak English, can't express himself, and that he's from India and should just go home." Davis ceased having any affiliation with the Hospital in December 2000, and did not take part in any of the proceedings that resulted in the revocation of Dr. Bhatt's privileges.

## II.    LEGAL STANDARD

Summary judgment is required on an issue or a claim when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-52 (1986); *Saldana v. Kmart Corp.*, 260 F.3d 228, 231-32 (3d Cir. 2001). An issue is "material" only if the factual dispute "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

"Summary judgment procedure is properly regarded not as a disfavorable procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to

secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (internal quotation marks omitted). The parties have a duty to present evidence; neither statements of counsel in briefs nor speculative or conclusory allegations satisfy this duty. *Ridgewood Bd. of Educ. v. N.E. for M.E.*, 172 F.3d 238, 252 (3d Cir. 1999). After the moving party has filed a properly supported motion, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The non-moving party must make a showing sufficient to establish the existence of each element essential to her case on which she will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322-23. The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the non-moving party on that issue. *See Anderson*, 477 U.S. at 249.

## III.    ANALYSIS

Brownsville seeks summary judgment claiming that Dr. Bhatt has failed to establish a *prima facie* case of racial discrimination under §1981. Brownsville also claims that even had Dr. Bhatt established a *prima facie* case, he has not rebutted with credible evidence of pretext the Hospital's legitimate, non-discriminatory reason for revoking his privileges or taking other adverse actions against him. Finally, Brownsville argues that it is immune under the Health Care Quality Improvement Act of 1986 (HCQIA), 42 U.S.C. §11101 *et seq.*, from any damage award on Dr. Bhatt's breach of contract claims regarding the enforcement of its By-Laws.

Dr. Bhatt disputes the Hospital's assertions, arguing that he has set forth sufficient facts from which a factfinder could infer that race, and not performance, was the motivating factor in Brownsville's decision to revoke his privileges. Dr. Bhatt also argues that the other allegedly adverse actions taken against him by the Hospital were also motivated by his race. Finally, Dr. Bhatt contends that the HCQIA does not immunize the Hospital from his state law breach of contract claims because of defects in Brownsville's Fair Hearing Procedure.

A.    §1981 Claim

Section 1981, as amended by the Civil Rights Act of 1991, provides:

[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licences, and exactions of every kind, and to no other.

42 U.S.C. §1981(a).  The coverage of the statute "includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. §1981(b).   These rights are protected from encroachment by both private and state actors.  *See* 42 U.S.C. §1981(c).  Although §1981 does not explicitly mention race, it prohibits racial discrimination. *See Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 609 (1987).

The parties agree that Dr. Bhatt's §1981 claims implicate the burden-shifting framework the Supreme Court articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). While Dr. Bhatt's brief refers to "direct evidence" of the Hospital's alleged discriminatory intent, it does so in the context of the *McDonnell Douglas* burden-shifting analysis, and, as such, does not appear to invoke a mixed-motive theory.

The Court of Appeals for the Third Circuit has summarized the proper application of the *McDonnell Douglas* framework as follows:

> Briefly summarized, the *McDonnell Douglas* analysis proceeds in three stages.  First, the plaintiff must establish a prima facie case of discrimination.  If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. While the burden of production may shift, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."

-25-

*Jones v. School Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999) (alteration in original)

(citations omitted). In the instant case, Dr. Bhatt presents two distinct claims of racial

discrimination. First, he claims that the revocation of his privileges was motivated by his race

instead of his performance. In addition, Dr. Bhatt claims that the Hospital discriminated against

him by interfering with his practice of medicine by, *inter alia*, refusing to allow him to retrieve

mail, including patient test results, after his privileges were suspended.

### 1.    Prima Facie Case

The Court of Appeals for the Third Circuit has stated in the context of a §1981 claim that

"the elements of a *prima facie* case depend on the facts of the particular case." *Jones*, 198 F.3d

at 411. Where, as here, the plaintiff is a non-employee physician complaining of allegedly

discriminatory acts of a hospital with whom he is affiliated, the elements of a *prima facie* case

for a §1981 claim are: (1) that the plaintiff belongs to an "identifiable class [] of persons who are

subjected to intentional discrimination solely because of their ancestry or ethnic characteristics,"

*Saint Francis College*, 481 U.S. at 613; (2) the defendant intended to discriminate against

plaintiff on that basis; and (3) defendant's racially discriminatory conduct abridged a contract or

right enumerated in §1981(a). *See, e.g., Pamintuan v. Nanticoke Memorial Hosp., Inc.*, No. C.A.

965-233-SLR, 1998 WL 743680 at \*12 (D. Del. 1998), *aff'd*, 192 F.3d 378 (3d Cir. 1999).[5]

The parties do not dispute that as a native of India, Dr. Bhatt satisfies the first element of

his *prima facie* case. Nor do the parties dispute that the allegedly discriminatory revocation of

Dr. Bhatt's staff privileges at the Hospital and the allegedly discriminatory treatment of his

patients, if true, would interfere with a right protected by §1981. Brownsville disputes that Dr.

---

[5]     Plaintiff has advanced what he refers to as "the most common formulation of the *prima facie*
elements" as requiring a showing that:
   (1)     Plaintiff is a member of a protected class;
   (2)     Plaintiff was qualified for the position in question;
   (3)     Plaintiff was subjected to an adverse employment action; and,
   (4)     Plaintiff was subjected to the adverse employment action under circumstances
           giving rise to an inference of discrimination.
The foregoing standard is inapplicable to the instant case because Dr. Bhatt has not asserted that
he was an "employee" of the Hospital. Therefore, the Court will instead apply the three element
standard accepted by the Third Circuit in *Pamintuan*.

Bhatt has established that any of these allegedly discriminatory activities were undertaken because of his race.

To establish the second element of his *prima facie* case, Dr. Bhatt "must point to facts of record which, if proved, would 'establish that [defendant's] actions were racially motivated and intentionally discriminatory,' or, at least, 'support an inference that defendants intentionally and purposefully discriminated' against [him] on the basis of [his] race." *Pamintuan*, 1998 WL 743680, at *13 (citations omitted).  In an effort to meet his burden on this element regarding both of his §1981 claims, Dr. Bhatt points to two statements evidencing bias against Indian doctors that he claims were made by persons affiliated with the Hospital.  Dr. Bhatt alleges that in 2000 he approached Dr. Ewald, who was then Chief of Staff at the Hospital, for advice after his medical charts began to be scrutinized, and that Dr. Ewald responded to his request for help by stating words to the effect of:  "Help?  You should have been out of here a long time ago, you Indian."  Though Dr. Ewald has denied ever making this statement, the Court accepts Dr. Bhatt's account of this conversation as true for purposes of this summary judgment motion.

The second statement cited by Dr. Bhatt was allegedly made during a 1999 proceeding regarding the theft of Dr. Bhatt's prescription pads at the Centerville Clinic.  At that hearing, the attorney for one of the employees accused of the theft was James Davis, who later served on Brownsville's Board of Directors.  Dr. Bhatt alleges that during the 1999 proceeding, attorney Davis told him that "he can't speak English, he can't express himself, and that he's from India and should just go home."  Though Mr. Davis denies ever making this statement, the Court accepts Dr. Bhatt's account as true for the purposes of this summary judgment motion. Nevertheless, it is undisputed that attorney Davis was neither a member of the Hospital's Board of Directors at the time Dr. Bhatt's privileges were revoked, nor was he a member of the Board at the time of the alleged actions which Dr. Bhatt claims interfered with his practice of medicine. Dr. Bhatt has produced no other evidence of discriminatory intent, and therefore the Court must now consider whether this evidence is sufficient to establish the existence of circumstances giving rise to an inference that the Hospital's alleged interference with his practice of medicine

-27-

or the revocation of his privileges were motivated by racial animus.  These issues are addressed in turn.

          **a.**      **Sufficiency Of Evidence Of Intent To Discriminate On The Basis Of Race Regarding Actions Allegedly Detrimental To Dr. Bhatt's Practice Of Medicine Including Mistreating Patients, Delaying Test Results And Withholding Mail.**

Regarding Dr. Bhatt's claims that the Hospital interfered with his practice of medicine by treating his patients poorly, delaying test results, and withholding his mail, there is insufficient evidence to raise an inference that these actions were motivated by his race.  Dr. Bhatt has proffered no specific evidence of any patient being mistreated by the Hospital, instead attempting to rely upon his own generalized deposition testimony claiming that his patients were mistreated as soon as his privileges were suspended in 2001.  Dr. Bhatt has produced no evidence that Dr. Ewald or attorney Davis were in any way involved with the alleged decision of the Hospital to mistreat his patients, delay test results, or to refuse to admit his patients to the Hospital. Moreover, Dr. Bhatt admits to not knowing who was in charge of the alleged decision of the Hospital not to forward his mail after his privileges were suspended.  The only documentary evidence on the issue is a letter from Ms. Sara Poling, CEO of the Hospital, which advised Dr. Bhatt that she conveyed his concerns regarding mail delivery to the appropriate persons within the Hospital in an effort to resolve "any potential problems which may have been caused."  Dr. Bhatt offers no evidence that Ms. Poling was in any way biased against Indians or anyone else.

Under these circumstances, the Court cannot find any evidence that would create an inference that these allegedly discriminatory acts by the Hospital were motivated by Dr. Bhatt's race.  Even accepting that all of these adverse actions occurred and impacted Dr. Bhatt's practice of medicine, there is no evidence that racial bias played any role in the Hospital's conduct.  Dr. Bhatt has not established any link whatsoever between the two discriminatory statements of Dr. Ewald and attorney Davis and the adverse actions by Brownsville.  Moreover, Dr. Bhatt has produced no evidence that any non-Indian doctors whose privileges were revoked by the Hospital were treated in a more favorable manner than was he.  As such, the Court finds that Dr. Bhatt has

not stated a *prima facie* case of racial discrimination under §1981 regarding the alleged interference with his practice of medicine.

**b.      Sufficiency of Evidence Of Intent To Discriminate On The Basis Of Race Regarding The Revocation Of Dr. Bhatt's Privileges**

Dr. Bhatt's evidence of intent to discriminate is slightly more persuasive when considered in relation to the Hospital's revocation of his privileges.  It is undisputed that Dr. Ewald was the Chief of Staff at the time the Hospital conducted Dr. Bhatt's review.  By virtue of his position, Dr. Ewald was also the Chair of the Medical Executive Committee which made the initial recommendation to revoke Dr. Bhatt's privileges.  As the Chair of the MEC, Dr. Ewald also would have been the person to present its recommendation to the Board of Directors.  Assuming that Dr. Ewald made the discriminatory statement attributed to him by Dr. Bhatt, it may be sufficient to overcome Dr. Bhatt's relatively light burden of establishing a *prima facie* case of discrimination.   Unlike Dr. Bhatt's other §1981 claim, Dr. Ewald was at least connected with the events giving rise to the revocation of Dr. Bhatt's privileges.  Despite the fact that this alleged statement occurred between one and two years before the MEC recommended that Dr. Bhatt's privileges be revoked, the Court will give Dr. Bhatt the benefit of the doubt regarding this issue and will proceed to the next step in the *McDonnell Douglas* analysis.

**2.      Pretext Analysis Regarding The Hospital's Proffered Legitimate, Non-Discriminatory Reasons For Revoking Dr. Bhatt's Privileges**

To rebut Dr. Bhatt's allegations that his privileges were revoked because of his race, the Hospital cites significant issues concerning Dr. Bhatt's professional judgment, quality of care, lack of clinical judgment, and lack of understanding of a disease process and/or course of treatment which would be consistent with proper patient care.  The parties do not dispute that these proffered reasons qualify as legitimate, non-discriminatory bases for revoking a physician's privileges.

To survive summary judgment when the defendant has articulated a legitimate, non-discriminatory reason for its action, a plaintiff must point to some evidence, direct or

-29-

circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the defendant's action. *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). The plaintiff must point to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [defendant's] proffered legitimate reasons [such] that a reasonable factfinder could rationally find them 'unworthy of credence'" and hence infer that the proffered nondiscriminatory reason "did not actually motivate the [defendant's] actions." *Simpson v. Kay Jewelers, Inc.*, 142 F.3d 639, 644-45 (3d Cir. 1998) (citations omitted). To show that discrimination was more likely than not a cause of the defendant's action, the plaintiff must point to evidence with sufficient probative force that a factfinder could conclude, by a preponderance of the evidence, that race was a motivating or determinative factor in the decision. *See Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1111 (3d Cir. 1997).[6]

In the instant case, none of the evidence proffered by Dr. Bhatt is sufficient to meet his burden to show that the Hospital's stated reasons for revoking his privileges were pretextual. As an initial matter, the alleged statement of Dr. John Ewald cannot suffice. Although Dr. Ewald was the Chair of the MEC that initially recommended that Dr. Bhatt's privileges be revoked, the final decision to revoke Dr. Bhatt's privileges was made only after a full hearing before the FHC, an appeal to the ARC, and consideration by the Hospital's Board of Directors. Significantly, Dr. Ewald was not a member of any of these three groups. Although Dr. Ewald testified before the FHC and was subject to cross-examination by Dr. Bhatt's counsel, at no time during the FHC hearing did the issue of racial bias ever surface, and Dr. Ewald was never questioned regarding the racist statement he allegedly uttered years before. As such, it qualifies as a stray remark by a non-decisionmaker or a decisionmaker unrelated to the decision process, which is afforded little evidentiary weight, particularly because it was "made temporally remote from the date of decision." *Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1993). *See*

---

[6]    The Court recognizes that *Keller*, *Simpson* and *Fuentes* are not racial discrimination cases, but the standards articulated therein have also been applied by the Third Circuit to race discrimination claims. *See, e.g., Jones*, 198 F.3d at 413.

*also Gomez v. Allegheny Health Services, Inc.*, 71 F.3d 1079, 1085 (3d Cir. 1995); *Fuentes*, 32 F.3d at 767. The alleged statements of attorney Davis are likewise immaterial to the pretext analysis, as he was not even remotely connected to the Brownsville decisionmakers at the time Dr. Bhatt's privileges were revoked.

Dr. Bhatt next argues that the Hospital's proffered reasons for revoking his privileges were a pretext for discrimination because he was the only doctor "singled out" by the Hospital for patient care issues, even though many doctors provided care to the patients at issue. This argument is likewise unpersuasive because Dr. Bhatt has offered no evidence regarding the other physicians who cared for these patients that would indicate that they avoided review because of their race. Moreover, Dr. Bhatt has offered no evidence that any of these other doctors had patient care problems of the magnitude and frequency as did he.

Dr. Bhatt also argues that the testimony of his expert witness provides evidence of pretext because Dr. Haus opined that the patient care problems attributed to Dr. Bhatt were ridiculous and fabricated. The Court notes that Dr. Haus' opinion stands in opposition to some fifteen other physicians who reviewed Dr. Bhatt's charts and found his care to be substandard. Indeed, the independent medical expert hired by the Hospital to review Dr. Bhatt's charts expressly found that "inappropriate fluid management was a significant contributor" to the death of one patient. Moreover, Dr. Singh, himself an Indian doctor at the Hospital, testified that Dr. Bhatt had improperly cared for another patient by ordering "unnecessary testing and treatment which killed her."

Dr. Bhatt also cites the testimony of Dr. Haus which disputes the medical findings of the three-level review process Dr. Bhatt underwent before his privileges were revoked. Under these circumstances, Dr. Haus' testimony can, at best, establish a difference of opinion between doctors regarding patient care. While Dr. Bhatt may quarrel with the Hospital's conclusions regarding these particular patients, the *bona fides* of the Hospital's determinations cannot be doubted in light of its reliance on the reasoned opinions of so many reviewing doctors, including other doctors of Dr. Bhatt's race. As such, the evidence offered by Dr. Bhatt could not persuade

-31-

a reasonable factfinder to conclude, by a preponderance of the evidence, that the Hospital's proffered legitimate reasons for revoking his privileges were mere pretext. Accordingly, the Hospital is entitled to summary judgment.

### B.    Health Care Quality Improvement Act

The remaining counts of Dr. Bhatt's complaint assert claims for breaches of contract regarding the Hospital By-Laws. Brownsville asserts that it is immune from all such claims under the Health Care Quality Improvement Act of 1986 (HCQIA), 42 U.S.C. §11101 *et seq.* Congress passed the HCQIA "to improve the quality of medical care by encouraging physicians to identify and discipline other physicians who are incompetent or who engage in unprofessional behavior." H.R.Rep. No. 903, 99th Cong., 2d Sess. (Sept. 26, 1986), *reprinted in* 1986 U.S.C.C.A.N. at 6384. Congress found that incompetent physicians could be identified through "effective professional peer review," which it decided to encourage by granting limited immunity from suits for money damages to participants in peer review actions. 42 U.S.C. §§11101(2), 11134. A "professional review action" must satisfy certain standards in order to provide immunity to the participants:[7]

> For purposes of the protection set forth in Section 11111(a) of this title, a professional review action must be taken–
>
> **(1)**    in the reasonable belief that the action was in the furtherance of quality health care,
>
> **(2)**    after a reasonable effort to obtain the facts of the matter,
>
> **(3)**    after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

---

[7]    The HCQIA defines a "professional review action" as "an action or recommendation of a professional review body which is taken or made in the conduct of a professional review activity . . . which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of a physician." 42 U.S.C. §11151(9).

The HCQIA defines a "professional review activity" as "an activity of a health care entity with respect to an individual physician – (A) to determine whether the physician may have clinical privileges with respect to, or membership in, the entity, (B) to determine the scope or conditions of privileges or membership, or (C) to change or modify such privileges or membership." 42 U.S.C. §11151(10).

The parties do not dispute that the adverse actions taken against Dr. Bhatt by the Hospital qualify as "professional review actions" under the statute.

>          **(4)**   in the reasonable belief that the action was warranted by the
>                    facts known after such reasonable effort to obtain facts and
>                    after meeting the requirement of paragraph (3).
> A professional review action shall be *presumed to have met the preceding*
> *standards* necessary for the protection set out in Section 11111(a) of this
> title *unless the presumption is rebutted by a preponderance of the evidence.*

42 U.S.C. §11112(a) (emphasis added).  The statutory presumption that a peer review action is

valid unless proved otherwise results in an "unusual standard" for granting summary judgment to

a defendant, as "the *plaintiff* bears the burden of proving that the peer review process was *not*

reasonable."  *Matthews v. Lancaster General Hospital*, 87 F.3d 624, 633 (3d Cir. 1996) (internal

quotations and citations omitted) (emphasis in original).  In this way, "the HCQIA places a high

burden on a physician to demonstrate that a professional review action should not be afforded

immunity."  *Gordon v. Lewistown Hospital*, 423 F.3d 184, 202 (3d Cir. 2005) (citing 42 U.S.C.

§11112(a)).

 Dr. Bhatt asserts three arguments against HCQIA immunity on his state law claims.  First,

he argues that §11112(a) is not satisfied in this case because various physicians provided care to

the patients whose charts were reviewed, yet Dr. Bhatt was the only one held responsible.  Dr.

Bhatt also asserts that no other physician made any objection to the care he was providing to

these patients at the time that the care was actually provided, and that none of the procedures that

are to be followed in the event of an inappropriate admission to the Hospital was ever triggered.

In addition, he cites the testimony of his expert witness, Dr. Haus, who opined that the charges

against Dr. Bhatt were ridiculous and fabricated.  Dr. Bhatt argues that this evidence shows that

the Hospital could not have reasonably concluded that taking professional action against him

would actually restrict incompetent behavior or protect patients, as is required by the first prong

of §11112(a), nor was the Hospital's decision to revoke his privileges made with the reasonable

belief that such action was warranted by the known facts, as is required by the fourth prong of

§11112(a).  Dr. Bhatt also argues that the third prong of §11112(a) has not been satisfied because

of Brownsville's refusal to call certain physician witnesses requested by Dr. Bhatt's counsel, its

refusal to procure state ranking information regarding Dr. Bhatt, and its decision to appoint three

physicians to the FHC who were affiliated with Centerville Clinic. Dr. Bhatt claims that these facts show that he was deprived of his procedural rights, which prevented him from receiving a truly fair hearing.

The Court must review the record in this case "to determine whether [Dr. Bhatt] satisfied his burden of producing evidence that would allow a reasonable jury to conclude that the Hospital's peer review disciplinary process failed to meet the standards of the [HCQIA]." *Matthews*, 87 F.3d at 633 (citation omitted). Thus, the Court will "undertake the inquiry mandated by each of §11112(a)'s four prongs to determine" if summary judgment in favor of the Hospital is proper based upon HCQIA immunity. *Id.* at 634.

**1.    Reasonable Belief That The Action Was In Furtherance Of Quality Health Care**

The Third Circuit has held that the first prong of the §11112(a) inquiry requires the application of an "objective standard" in determining whether a professional review action was taken in a reasonable belief that the action was in furtherance of quality health care. *Matthews*, 87 F.3d at 635. Accordingly, any subjective bad faith by Brownsville is immaterial to the inquiry. *Id.* Rather, the standard is satisfied "if the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their actions would restrict incompetent behavior or would protect patients." *Id.*

The totality of the circumstances surrounding the professional review action taken against Dr. Bhatt reveal that the Hospital held a reasonable belief that revocation of his staff privileges would further quality health care. Prior to any recommendation to that effect, the URC first voted to send several charts of Dr. Bhatt's patients for an impartial external review after discovering anomalies in the care he provided. The MEC then reviewed this decision and voted to adopt the URC's recommendation. The charts were then sent to Dr. Roberts for review. Dr. Roberts' report identified several major deficiencies in the care provided to these patients by Dr. Bhatt. Upon consideration of Dr. Roberts' report and the reports of the other Hospital committees, the MEC then voted to recommend revocation of Dr. Bhatt's privileges. At the FHC hearing, Dr. Roberts' report was presented along with the testimony of various Brownsville

-34-

physicians which further supported a finding that Dr. Bhatt had provided substandard care to these patients. Dr. Bhatt has produced no evidence that any bias against him, racial or otherwise, actually entered into the decisionmaking process, nor has he shown that the Hospital considered any evidence that was unrelated to the quality of health care that he had provided in rendering its final decision.

The Court finds unavailing Dr. Bhatt's argument that the Hospital's failure to investigate the conduct of the other doctors involved with the care of the patients in question renders unreasonable any belief that revoking his privileges would further quality health care. Dr. Bhatt appears to argue that removing him from the Hospital could not further quality health care because the other doctors who cared for the same patients were not investigated or removed. This argument is logically flawed. As an initial matter, accepting this argument would require the Court to conclude that no hospital could be immune from damages for professional review actions regarding any one incompetent doctor, so long as other arguably incompetent doctors had not yet been subjected to such actions. Nothing in the HCQIA or its legislative history supports such a counter-intuitive approach. Indeed, as the Third Circuit stated in *Pamintuan*, "nothing in the statute, legislative history, or case law suggests the competency of other doctors is relevant in evaluating whether [the hospital] conducted a reasonable investigation into [a doctor's] conduct." *Pamintuan*, 192 F.3d at 389 (citing *Smith v. Ricks*, 31 F.3d 1478, 1486 (9th Cir. 1994) (alteration in original). Rather, common sense dictates that regardless of how many arguably incompetent doctors may have privileges at a given hospital, the removal of any one them advances the cause of quality health care.

Dr. Bhatt's other arguments that the Hospital had no reasonable belief that the action taken against him would further quality health care are likewise unavailing. Dr. Bhatt notes that his treatment of the patients at issue did not trigger internal Hospital controls designed to catch improper care. This contention is irrelevant to the question of whether the Hospital reasonably believed that suspending Dr. Bhatt's privileges would further quality health care. Likewise, the fact that one witness, Dr. Haus, testified that Dr. Bhatt's care was adequate does not render

-35-

unreasonable the Hospital's belief that revoking his privileges would further quality health care. Indeed, the Hospital's acceptance of the report of an independent outside reviewer with impeccable credentials is eminently reasonable, and the mere fact that Dr. Haus disagrees with that report does not render it otherwise. *See, e.g., Matthews*, 87 F.3d at 636 n.9 (conflicting expert reports do not establish unreasonableness of belief that quality of health care is being improved where no evidence exists that report relied upon is "so obviously inadequate or inaccurate" that reliance on it was itself unreasonable).

Because Dr. Bhatt has not produced sufficient evidence to rebut the statutory presumption that the Hospital's actions were taken in the reasonable belief that they would further quality health care, the Court finds that the Hospital has met the requirements of the first prong of §11112(a).

### 2.     Reasonable Effort To Obtain The Facts

Dr. Bhatt argues that the Hospital's decisions not to review the performance of other doctors or his own state ranking information were unreasonable. The Third Circuit has determined that the proper standard for reviewing the reasonableness of a factual investigation under the HCQIA is "whether the totality of the process leading up to [the professional review action] evidenced a reasonable effort to obtain the facts of the matter." *See Matthews*, 87 F.3d at 637. It is important to note that a "[p]laintiff is entitled to a reasonable investigation under the [HCQIA], not a perfect investigation." *Sklaroff v. Allegheny Health Educ. Research Found.*, 1996 WL 383137, at *8 (E.D. Pa. July 8, 1996), *aff'd*, 118 F.3d 1578 (3d Cir. 1997).

After review of the totality of Brownsville's investigative process, the Court is satisfied that its efforts were reasonable. The record in this case reveals that two Hospital committees, numerous Hospital physicians, and one independent reviewer all contributed to the investigation of the care that Dr. Bhatt was providing prior to the decision to revoke his privileges. To further this investigation, the Hospital established an MEC subcommittee dedicated to the task of discerning the facts surrounding these incidents. Though Dr. Bhatt believes that the testimony of more witnesses and the introduction of his state ranking information may have helped his case,

the absence of such evidence does not transform the detailed and multi-layered review of patient charts conducted by the Hospital into an unreasonable effort.

Because Dr. Bhatt bears the burden of rebutting the statutory presumption that the fact-finding efforts were reasonable and has not produced sufficient evidence to overcome that presumption, the Court finds that the Hospital has met the requirements of the second prong of §11112(a).

**3. Adequate Notice And Hearing Procedures**

A defendant can satisfy the third prong of §11112(a) of the HCQIA in two ways. First, it can show that it complied with all of the requirements of §11112(b), which creates a "safe harbor." *Brader*, 167 F.3d at 841. Second, it can show that the notice and procedures afforded were fair under the circumstances. *See* 42 U.S.C. §11112(a)(3).

The Defendant may qualify for "safe harbor" protection by establishing that the notice of the proposed action, the notice of hearing, and the conduct of the hearing and notice conform to the requirements of §11112(b), except to the extent that any of these protections have been waived.

**a. Notice Of Proposed Action**

Regarding the notice of the proposed action, the statute requires

> **(1) Notice of proposed action**
>
> The physician has been given notice stating--
>
> **(A)** **(i)** that a professional review action has been proposed to be taken against the physician,
>
> **(ii)** reasons for the proposed action,
>
> **(B)** **(i)** that the physician has the right to request a hearing on the proposed action,
>
> **(ii)** any time limit (of not less than 30 days) within which to request such a hearing, and
>
> **(C)** a summary of the rights in the hearing under paragraph (3).

42 U.S.C. §11112(b)(1). The undisputed evidence of record in this case reveals that the Hospital

sent a letter dated December 13, 2001 that:  (1) informed Dr. Bhatt of the MEC's decision to

recommend that his privileges be revoked; (2) informed Dr. Bhatt that the recommendation was

because "the ongoing monitoring of the care rendered by you at Brownsville Hospital reveals a

pattern of care which is substantially below any reasonable or acceptable standard of care;" (3)

informed Dr. Bhatt of his right to request a hearing and the deadline for doing so; and (4)

enclosed a copy of the Hospital's Fair Hearing Plan describing his rights regarding the hearing.

As such, the notice of proposed action given to Dr. Bhatt not only satisfied the safe harbor

requirement of §11112(b)(1), but was fair under the circumstances.[8]

> ### b.    Notice Of Hearing

Regarding the notice of hearing, the safe harbor provision of the HCQIA states:

> **(2)    Notice of hearing**
>
> If a hearing is requested on a timely basis under paragraph (1)(B), the
> physician involved must be given notice stating-
>
> > **(A)**    the place, time, and date, of the hearing, which date shall
> > not be less than 30 days after the date of the notice, and
> >
> > **(B)**    a list of the witnesses (if any) expected to testify at the
> > hearing on behalf of the professional review body.

42 U.S.C. §11112(b)(2).  The parties do not dispute that Dr. Bhatt made a timely request for a

hearing and that Brownsville informed him of the time and date of the scheduled hearing.  The

undisputed record evidence also shows that the Hospital acquiesced to the request of Dr. Bhatt's

counsel to postpone the hearing twice from the original date of January 31, 2002 until May 16,

---

[8]    The Court recognizes that §11112(b)(1)(B)(ii) states that a doctor must be informed of the thirty
day deadline for requesting a hearing.  The undisputed record evidence in this case shows that
the Hospital did not comply with this requirement as it gave Dr. Bhatt only fourteen days to
request his hearing.  However, because Dr. Bhatt timely requested a hearing and did not raise any
objection that the notice was inadequate, the Court deems this issue waived.  *See* 42 U.S.C.
§11112(b) (a healthcare entity is "deemed to have met the adequate notice and hearing
requirement . . . if the following conditions are met (or are waived voluntarily by the
physician)").  Regardless, the Court finds that even if this technical defect disqualified the
Hospital from safe harbor protection, the notice was fair under the circumstances.  *See* 42 U.S.C.
§11112(a)(3).

2002. Moreover, the Hospital informed Dr. Bhatt's lawyer of the patients whose cases would be discussed at the hearing. The time given was sufficient for Dr. Bhatt to have an expert witness review the appropriate patient charts and prepare a report regarding the care provided. The record is devoid of Dr. Bhatt or his counsel making any objection to the notice of hearing provided to them. Thus, even though the Hospital did not provide Dr. Bhatt with notice of the witnesses expected to testify and thus cannot claim "safe harbor" for the notice of hearing, *see* 42 U.S.C. §11112(b)(2)(B), the Court finds that the notice given to Dr. Bhatt was fair under the circumstances. The letters and conversations between the Hospital and Dr. Bhatt's lawyers unquestionably conveyed the information needed for Dr. Bhatt to appear and present an informed defense to the Hospital's allegations.

### c.    Conduct Of Hearing And Notice

The HCQIA grants safe harbor protection to a health care entity regarding the conduct of a hearing when the following conditions and safeguards are in place:

> **(3)    Conduct of hearing and notice**
>
> If a hearing is requested on a timely basis under paragraph (1)(B)--
>
> > **(A)**    subject to subparagraph (B), the hearing shall be held (as determined by the health care entity)--
> >
> > > **(i)**    before an arbitrator mutually acceptable to the physician and the health care entity,
> > >
> > > **(ii)**    before a hearing officer who is appointed by the entity and who is not in direct economic competition with the physician involved, or
> > >
> > > **(iii)**    before a panel of individuals who are appointed by the entity and are not in direct economic competition with the physician involved;
> >
> > **(B)**    the right to the hearing may be forfeited if the physician fails, without good cause, to appear;
> >
> > **(C)**    in the hearing the physician involved has the right--
> >
> > > **(i)**    to representation by an attorney or other person of the physician's choice,
> > >
> > > **(ii)**    to have a record made of the proceedings, copies of

which may be obtained by the physician upon payment of any reasonable charges associated with the preparation thereof,

**(iii)**   to call, examine, and cross-examine witnesses,

**(iv)**   to present evidence determined to be relevant by the hearing officer, regardless of its admissibility in a court of law, and

**(v)**   to submit a written statement at the close of the hearing; and

**(D)**   upon completion of the hearing, the physician involved has the right–

**(i)**   to receive the written recommendation of the arbitrator, officer, or panel, including a statement of the basis for the recommendations, and

**(ii)**   to receive a written decision of the health care entity, including a statement of the basis for the decision.

A professional review body's failure to meet the conditions described in this subsection shall not, in itself, constitute failure to meet the standards of subsection (a)(3) of this section.

42 U.S.C. §11112(b)(3). The undisputed record evidence in this case establishes that the hearing before the FHC was conducted by a hearing officer appointed by the Hospital who was not in economic competition with the physician involved. *See* 42 U.S.C. §11112(b)(3)(A)(ii). In addition, the FHC appointed by the Hospital to evaluate the evidence in Dr. Bhatt's hearing was comprised of six physicians, and the record contains no evidence that any of them were Dr. Bhatt's direct economic competitors. *See* 42 U.S.C. §11112(b)(3)(A)(iii).

Dr. Bhatt argues that the composition of the FHC was improper because three of the appointed doctors were also affiliated with Centerville Clinic, with whom Dr. Bhatt had a dispute after his wife sued her treating psychiatrist at that facility after their extramarital affair. However, the statute only prohibits physicians who are economic competitors from service on such a review panel. Therefore, Dr. Bhatt's arguments on this issue are unavailing, and the Court finds that the Hospital has satisfied the requirements of §11112(b)(3)(A).

-40-

The undisputed record evidence also establishes that Dr. Bhatt was represented by an attorney at the hearing and was permitted to call and cross-examine witnesses. A record was made of the proceedings, which was available to Dr. Bhatt. Dr. Bhatt was permitted to introduce evidence at the hearing, including his own testimony and the testimony and report of his expert witness, Dr. Haus.[9]  After the hearing, both parties submitted written statements. Accordingly, the Court finds that the Hospital has satisfied all of the requirements of §11112(b)(3)(c) in conducting the hearing.

The record also establishes that, after the FHC had heard all of the evidence and deliberated, Dr. Bhatt was provided with an explicit statement of the basis for the FHC's recommendation to revoke his privileges. Dr. Bhatt was then granted an appellate hearing regarding the FHC decision, in which he was again represented by counsel and was permitted to make an oral argument before the ARC. After the ARC affirmed the FHC recommendation to revoke Dr. Bhatt's privileges, the recommendation was considered by the Board of Directors. Dr. Bhatt then was notified of the Board's decision to affirm the findings of the MEC, as recommended by the ARC. For these reasons, the Court finds that the Hospital provided Dr. Bhatt with a hearing that was fair under the circumstances, and has satisfied the requirements of §11112(b)(3)(D).

Because the Hospital has established that the procedure used to conduct the hearing regarding the professional review of Dr. Bhatt was fair under the circumstances and satisfied all of the requirements of §11112(b), the Court finds that Dr. Bhatt has not produced sufficient evidence such that a reasonable trier of fact could conclude that the Hospital did not afford him

---

[9]  Dr. Bhatt has argued that his ability to present evidence was hindered by the Hospital because the other doctors involved in the care of the patients who were discussed at the hearing were not called to testify and Dr. Bhatt's state ranking information was not obtained. However, Dr. Bhatt's evidence that these requests were ever made to the Hospital is viewed skeptically by the Court, as it consists of a double-hearsay statement that was allegedly made by Dr. Ewald to Dr. Bhatt's counsel, who then allegedly told Dr. Haus (who is the declarant of the statement). Regardless, even accepting this allegation as true, the Court views this request as akin to a request for a "comparative review" of Dr. Bhatt's performance relative to that of other physicians at the Hospital, which the Third Circuit has determined is not required for a professional review action to be valid. *See Pamintuan*, 192 F.3d at 389.

adequate notice and hearing procedures. Therefore, the Court finds that Brownsville has met the requirements of the third prong of §11112(a).

## 4.   Reasonable Belief That The Action Was Warranted By Known Facts

As the Third Circuit has recognized, analysis of the fourth prong of §11112(a) "closely tracks" the analysis of its first prong. *See Brader*, 167 F.3d at 843. In reviewing the reasonableness of the Hospital's belief that the professional review action was warranted, the Court is mindful of the Third Circuit's statement that "[t]he intent of [the HCQIA] was not to disturb, but to reinforce, the preexisting reluctance of courts to substitute their judgment on the merits for that of health care professionals and of the governing bodies of hospitals in an area within their expertise." *Brader*, 167 F.3d at 843 (alteration in original).

As previously outlined in Section III(B)(1), *supra*, all of Dr. Bhatt's arguments regarding the reasonableness of Brownsville's decision to revoke his privileges pertain to evidence that he believed should have been considered more heavily by the Hospital in making its decision. However, the undisputed evidence of record shows that the outside reviewer, Dr. Roberts, and several Brownsville physicians all found that Dr. Bhatt's treatment of patients was well below the acceptable standard of care. Indeed, the deaths of two patients were attributed to the care provided by Dr. Bhatt. Though Dr. Bhatt's expert witness disagrees with the conclusions of the other physicians, this fact is insufficient to rebut the statutory presumption that the Hospital's decision was based upon a reasonable belief that it was warranted under the facts known. *See Brader*, 167 F.3d at 843; *Matthews*, 87 F.3d at 638. Furthermore, there is no evidence, apart from Dr. Haus' contrary conclusions, that the report of Dr. Roberts was unreliable.

For the foregoing reasons, the Court cannot conclude that Dr. Bhatt has produced sufficient evidence from which a trier of fact could find by a preponderance of the evidence that Brownsville did not act with a reasonable belief that suspending his privileges was warranted by the known facts. Accordingly, Dr. Bhatt has failed to rebut the statutory presumption of validity that applies to the decision to revoke his privileges, and Brownsville has satisfied the

-42-

requirements of the fourth prong of §11112(a).

### 5.    Summary Of HCQIA Immunity

Because Dr. Bhatt has failed to rebut the statutory presumptions regarding any of the prongs of §11112(a), the Court finds that the Hospital is entitled to immunity from monetary damages under the HCQIA on all of Dr. Bhatt's state law claims. Therefore, summary judgment is proper on these claims as well.

An appropriate Order follows.


Thos M. Hardiman

Thomas M. Hardiman
United States District Judge


cc:    Counsel of Record

-43-